**UNITED SERVICES AUTOMOBILE AS-SOCIATION, Plaintiff,**

v.

**James Pearce WHARTON, Robert C. Pinner, Youngblood Truck Lines, Inc., James P. Erwin, Jr., Administrator of the Estate of Helen Duffy Wharton, Deceased, Don H. Garren, Ancillary Administrator of the Estate of James P. Wharton, Deceased, Dorothy Fay Duffy, Ancillary Administratrix of the Estate of Helen Duffy Wharton, Deceased, and James H. Wharton, Administrator, C.T.A. of the Estate of James P. Wharton, Defendants.**

Civ. No. 2145.

United States District Court
W. D. North Carolina,
Asheville Division.

Jan. 18, 1965.

Landon Roberts, Meekins, Packer & Roberts, Asheville, N. C., for plaintiff.

Van Winkle, Walton, Buck & Wall, Asheville, N. C., for Pinner and Youngblood Truck Lines, Inc.

Lamar Gudger, Asheville, N. C., for James P. Erwin, Jr.

R. Lee Whitmire, Whitmire & Whitmire, Hendersonville, N. C., for James P. Wharton and Don H. Garren, Dorothy Fay Duffy, Ancillary Adm'x of the Estate of Helen Duffy Wharton.

CRAVEN, Chief Judge:

This is a suit for declaratory judgment brought by United Services Automobile Association (an insurance company) to determine the extent of its obligation, if any, under a standard automobile liability insurance policy issued to Colonel James Wharton.

 Under the terms of the policy, United Services has no duty to defend claims or pay damages "caused intentionally by \* \* \* the insured." The principal question for decision is whether Colonel Wharton intentionally caused property damage and bodily injury (including death) within the exclusionary clause of the policy. The burden of establishing the exclusion rests upon United Services.

On June 21, 1961, at about 9:00 P.M., Colonel Wharton was driving his Pontiac automobile on U. S. 25 in Henderson County, North Carolina. His wife, Helen Wharton, was a passenger in the front seat. Coming from the opposite direction was a 1957 Mack tractor with trailer owned by Youngblood Truck Lines, Inc. and operated by Robert C. Pinner. The trailer was heavily loaded, and the unit was moving at a speed of about 40 miles per hour on its own right-hand side of the road. Although it had been raining, the rain had stopped sufficiently so that the tractor driver had ceased using his windshield wiper. The road was still damp, but not wet. It was not foggy, and visibility was good. Pinner saw the Wharton car approaching for a distance of at least 400 feet. When the vehicles got close to each other the Wharton automobile swerved to the left and collided head-on with the tractor trailer. The impact occurred in the lane of travel which was proper for the tractor trailer and the wrong side of the road for Colonel Wharton. No skid marks were discovered which could be attributed to the Wharton vehicle. The collision occurred on a reasonably straight stretch of road. No other vehicles were involved, and there were no impediments to vision of either driver. After the wreck, a broken whiskey bottle was discovered in Colonel Wharton's automobile. The seal around the neck of the bottle was also broken.

As a result of the collision, Mrs. Wharton died and Pinner was seriously injured. Substantial property damage to Youngblood's tractor trailer also resulted.

Subsequently, Colonel Wharton was indicted for the manslaughter of his wife. Henderson County Minute Docket Book 29, page 51, October 18, 1962, discloses a "settlement" of the criminal prosecution on the following basis: the Solicitor and counsel for Colonel Wharton agreed, subject to the approval of the court, (1) that defendant enter the plea of nolo contendere, (2) that defendant renounce his right to administer upon his wife's estate and all right of inheritance, (3) that defendant pay over to his wife's next of kin the sum of approximately $20,000.00 as a "voluntary" contribution, and (4) that no

further punishment be imposed upon the defendant. The judgment of the court was that prayer for judgment be continued upon payment of the costs. On the same day (October 18, 1962), a consent order was entered removing Colonel Wharton as administrator of the estate of his wife, Helen Duffy Wharton. On the previous day (October 17), Colonel Wharton renounced all interest in the estate of his wife and assigned all of his rights, if any, to administer upon the assets of the estate of his wife to her sister, Dorothy Fay Duffy. The instrument also contained the following: "Any damages recovered as the result of my wife's death is to be limited to the amount for which my insurance carrier is legally liable, and the said Dorothy Fay Duffy does by accepting the benefits received and to be received by this renouncement and conveyance, release me and my estate from any and all damages over and above said amount." It was signed by James P. Wharton and Dorothy Fay Duffy.

Colonel Wharton committed suicide while a patient in Walter Reed Hospital on July 5, 1963, and his ancillary administrator was thereafter substituted as party defendant in this litigation.

## I.

■ Under North Carolina law a plea of guilty or nolo contendere to automobile manslaughter does not establish *intentional* homicide. *Involuntary* homicide is also "manslaughter". The statute makes no distinction except as to punishment. N.C.G.S. § 14–18; See State v. Richardson, 221 N.C. 209, 19 S.E.2d 863 (1942).

The suicide and the criminal plea are bizarre circumstances in what would otherwise seem a routine automobile

tragedy. But, at most, they pose questions without providing answers.

On the basis of the foregoing findings of fact, considered alone, and without regard to what will now be narrated, I fail and refuse to find that Colonel Wharton *intentionally* wrecked his automobile. But there is more.

## II.

Helen D. Wharton died as a result of internal injuries caused by the collision about ten hours after it occurred. Before her death, and with an awareness of its imminency, on several occasions, and to several disinterested witnesses of excellent character, Helen Duffy Wharton made substantially the same dying declaration. The words were as follows:

> "Colonel Wharton put the accelerator on the floorboard and turned the car deliberately head-on into the tractor trailer. He did it on purpose. He asked me if I wanted to go to eternity with him. This collision was not an accident. He said, 'We will go to eternity together.'"

■ What is truth? Perhaps because there is no wholly satisfactory answer, it has long been settled that credibility is for the trier of fact—in this case the judge sitting without a jury. There is no question in my mind but that Helen Wharton made the statements attributed to her by the several disinterested witnesses. I also believe the truth of the matter asserted, i. e., that Colonel Wharton intentionally drove his vehicle into collision with the tractor trailer.[1]

Is Mrs. Wharton's dying declaration competent? May the court receive it in evidence, or must it be rejected because of an ill-begotten and authoritatively criticized exclusionary rule of evidence?[2] It

---

1. If the statements are thought to contain an opinion, it matters not. The opinion rule properly has no application to dying declarations. 5 Wigmore, Evidence, Section 1447, p. 247 (3rd Ed. 1940). Why I believe Mrs. Wharton's declaration is best left to psychologists. One "reason", on the conscious level, is that the doctor and nurses who heard

Mrs. Wharton left me with the impression *they* believed her.

2. 5 Id. Section 1431. All great text writers (McCormick, Wigmore, Greenleaf, Wharton) agree that dying declarations ought to be admitted in civil cases. 2B Barron & Holtzoff, Federal Practice and Procedure, Section 926, p. 210 n. 17 (1961).

is, of course, hearsay. That it is considered credible by the trier of fact is an incongruous irrelevancy under the orthodox exclusionary rules of evidence. "The theory of the hearsay rule is that the many possible deficiencies, suppressions, sources of error and untrustworthiness, which lie underneath the bare untested assertion of a witness, may be best brought to light and exposed by the test of cross examination." 5 Wigmore, Evidence, Section 1362, p. 3 (3rd Ed.1940). Ideally, all testimony ought to be so treated. Exceptions to the hearsay rule are based on the proposition that it may sometimes be better to have untested testimony than not to have it at all. This is such a case.

The dying declaration exception to the hearsay rule is based upon probability of trustworthiness and plain necessity. As early as 1761, Lord Mansfield recognized that special trust may be imposed in deathbed statements.[3] It is still thought to be so. But the main reason for the exception was simple necessity. Until about 1800, the rule was very simple: if a witness who would be called to testify if alive was unavailable by reason of his death, his declarations were competent and could be received in evidence. No distinction was made between civil and criminal cases.[4]

Aside from statute, only a few jurisdictions have restored the dying declaration exception to its original common law scope.[5] In most American jurisdictions, except where relief has been afforded by statute,[6] it is established that dying declarations may *not* be received in civil cases.[7] North Carolina has been such a jurisdiction since 1854 when the "correct" rule was overruled and abandoned. Barfield v. Britt, 2 Jones' Law, N.C., 41, 43 (1854), overruling McFarland v. Shaw, 2 N.C.Law Rep. 102 (1815).

Is this court bound by the North Carolina rule? The answer is to be found in Rule 43(a) of the Federal Rules of Civil Procedure. That rule has been said to illustrate the modern trend, which is to admit in evidence any matter which throws light on the controversy. 2B Barron & Holtzoff 211, Section 962 (1961). It is also said that Rule 43(a) gives the court much latitude in determining the admissibility of evidence. Doubts must be resolved in favor of admissibility. The fact that the state courts would exclude the testimony does not necessarily require its exclusion by a United States district court within that state. 2B Barron & Holtzoff, supra at 212.

There is now pending in the Superior Court of Henderson County an action for wrongful death against Colonel Wharton's estate brought by the administrator of the estate of Helen Duffy Wharton. By reason of a statute [8] specifically authorizing the reception of such evidence in a wrongful death action, the dying declaration of Mrs. Wharton *may* be received in evidence in the prosecution of the wrongful death action in Henderson County. Is it not ironic that United Services may be required to defend the wrongful death action, in which the collision *may* be shown to have been intentionally caused, because United Services

---

3. Shakespeare had recognized it earlier. King John V, 4.

4. Professor Wigmore explains how a misconstruction of the words of a treatise writer resulted in the "orthodox heresy" of limiting the use of dying declarations to criminal cases of homicide. See 5 Wigmore, Evidence, Section 1431 (3rd Ed. 1940).

5. Among jurisdictions following the correct and enlightened rule (according to Professor Wigmore) are Arkansas, Kansas, Louisiana and Pennsylvania. 31A C.J.S. Evidence § 238 n. 13, p. 644.

6. "In several jurisdictions the aid of the legislature has been invoked to stop the further defiance of common sense by the courts * * *." 5 Wigmore, Evidence, Section 1432, p. 223.

7. 31A C.J.S. Evidence § 238, p. 643.

8. N.C.G.S. § 28–173. It is difficult to construe the statute as extending to a suit for declaratory judgment because it authorizes reception of dying declarations "[i]n all actions brought under this section", i. e., suits for wrongful death.

may *not* show it to have been intentionally caused in this case?

Some of the circuits have interpreted Rule 43(a) as defining three categories of admissibility. It has been held "without enthusiasm" in the Third Circuit that unless a bit of evidence fits into one of the three standards for admissibility it must be rejected. Wright v. Wilson, 154 F.2d 616, 619, 170 A.L.R. 1237 (3rd Cir. 1946). Likewise, at one time the Fifth Circuit held that if state law excludes the evidence and no federal statute or rule admits it, then the evidence must be rejected. Atlantic Coast Line Railroad Co. v. Dickson, 207 F.2d 899, 903 (5th Cir. 1953).

But recently quite a different view has been taken in several circuits. In Dallas County v. Commercial Union Assurance Co., Ltd., 286 F.2d 388 (5th Cir. 1961), Judge John Minor Wisdom, writing for the Fifth Circuit, made no effort to fit the proffered evidence within the numerous exceptions to the hearsay rule. Although the court could find no case or statute, state or federal, authorizing reception, it nevertheless held the evidence admissible "because it is necessary and trustworthy, relevant and material, and its admission is within the trial judge's exercise of discretion in holding the hearing within reasonable bounds." Dallas County v. Commercial Union Assurance Co., Ltd., supra at 398. Commentators have generally approved this interpretation of Rule 43(a). 2B Barron & Holtzoff, supra, Section 962, p. 218; Green, The Admissibility of Evidence Under the Federal Rules, 1941, 55 H.L.R. 197, 205; 46 Cornell Law Quarterly 645.

In Hambrice v. F. W. Woolworth Co., 290 F.2d 557, 559 (5th Cir. 1961), the Fifth Circuit again followed the more liberal rule to admit evidence of habit to show conduct which the state would not have admitted, even in the absence of any federal precedent admitting such evidence.

In the Tenth Circuit the rule has been put negatively: "We have not been referred to any exclusionary principle laid down by any federal statute or rule of federal equity practice" making the evidence inadmissible. Although the challenged evidence was forbidden by state statute, the court held it to be both relevant and material, and admissible. Mutual Life Insurance Co. of New York v. Bohlman, 328 F.2d 289, 294 (10th Cir. 1964). In Hope v. Hearst Consolidated Publications, Inc., 294 F.2d 681, 684, 95 A.L.R.2d 213 (2d Cir. 1961), the court hesitantly constructed a "federal rule of evidence". Evidence which was clearly inadmissible in the state court was deemed admissible under the federal equity rule even though the particular case could not have been brought in equity prior to the rules.

Rule 43 speaks in affirmative terms of admissibility, not exclusion. It defines three standards for admissibility. But it does not purport to prohibit the admission of other relevant material probative evidence which, in the considered exercise of judicial wisdom, is trustworthy. Monarch Insurance Co. of Ohio v. Spach, 281 F.2d 401, 411 (5th Cir. 1960).

If a federal precedent closely similar to dying declaration is necessary, Franzen v. E. I. DuPont De Nemours & Co., 146 F.2d 837 (3rd Cir. 1944), and cases cited therein, is perhaps sufficient. That case held the deposition of a man, dead at time of trial, "clearly admissible" under a general federal rule.

This district court is, of course, guided and controlled chiefly by the decisions of the Fourth Circuit. That court, sitting en banc, in Thomas v. Hogan, 308 F.2d 355, 362 (4th Cir. 1962), held that the opinion evidence of a witness as to whether a person was drunk should have been admitted, though the state court would have excluded it. The decision was unanimous.[9] Chief Judge Sobeloff, writing for the court, footnoted three federal decisions which permitted opinion evidence as to mental condition. No effort was made to demonstrate a federal equity rule with respect to opinion as to intoxi-

9. Judges Boreman and Bryan dissented in part on another point. 308 F.2d at 363.

cation. Whatever may be the conceptual approach of the Fourth Circuit, its decisions are in harmony with the rationale of the Second, Fifth, and Tenth Circuits discussed supra.[10]

Rule 43(a)'s reference to rules of evidence applied in equity courts would be virtually meaningless were the courts to insist upon actual equity precedent—because there is little or none. See Hope v. Hearst Consolidated Publications, Inc., supra, 294 F.2d at 690.

On the supposition that a federal equity court was "run much like present day administrative agencies",[11] I conclude that a federal equity court would have admitted Mrs. Wharton's dying declaration in evidence, and adjudge it competent.

Taking it into account, and weighing it with the other facts found, I find as an ultimate fact that Colonel Wharton intentionally caused the collision and the resulting property damage, bodily injury and death.

The exclusion requires no interpretation. The policy does not insure against intentional torts.

### III.

Defendants assert that in any event the Financial Responsibility Motorist Law of either Maryland or North Carolina is to be read into the policy so as to provide limited coverage even as to intentional torts. Whether the conclusion is valid need not be resolved.

This policy was a "voluntary" one purchased by Colonel Wharton in Maryland. Colonel Wharton lived in Maryland at the time. His car was licensed in Maryland. Maryland law applies. North Carolina law does not.[12] And under Maryland law the provisions of the Maryland Financial Responsibility Act have no application to a "voluntary" policy.[13]

After the trial, by motion to amend its complaint, United Services seeks for the first time to have adjudicated in this action several disputes as between various party defendants, e. g., the effect as between the estates of Colonel Wharton and Mrs. Wharton of the $20,000.00 payment recited herein. By the same motion to amend, it also seeks to recover from the estate of Colonel Wharton the sum of $8,500.00 paid by United Services in settlement of the claim of Robert C. Pinner (the truck driver). During the trial, in response to inquiries from the court, counsel stated that the *only* question for adjudication was coverage under the policy. The motion to amend will be denied.

Alternatively, United Services has contended that its policy of insurance is avoided because of "non-cooperation" by its assured Colonel Wharton. The evidence, in my judgment, does not support the contention, and I fail and refuse to find that Colonel Wharton was guilty of non-cooperation within the terms of the policy so as to avoid it.

10. Hambrice v. F. W. Woolworth Co., 290 F.2d 557 (5th Cir. 1961), and Monarch Insurance Co. of Ohio v. Spach, 281 F.2d 401 (5th Cir. 1960), are cited in Thomas v. Hogan, 308 F.2d 355 at 362, (4th Cir. 1962) n. 23.

11. Moore so asserts. 5 Moore, Evidence Section 1312; Hope v. Hearst Consolidated Publications, Inc., 294 F.2d 681 at 684 (2d Cir. 1961). The premise is especially tenable in a non-jury trial. The common law rules of evidence, according to Professors Thayer and Wigmore, do not apply "ex stricto jure" in any tribunal but a jury-court. 1 Wigmore, Evidence, 2b, p. 27. "The importance of such other rules as the hearsay rule * * * and the rule against opinions, is minimized in non-jury cases. * * * 2B Barron & Holtzoff, Section 972 (1961).

12. Roomy v. Allstate Insurance Co., 256 N.C. 318, 123 S.E.2d 817 (1962).

13. National Indemnity Co. v. Simmons, 230 Md. 234, 186 A.2d 595; Fidelity & Casualty Co. v. McConnaughy, 228 Md. 1, 179 A.2d 117 (1962); Lewis v. Commercial Casualty Insurance Co., 142 Md. 472, 121 A. 259, 28 A.L.R. 1287 (1923).

An appropriate judgment will be entered to grant the relief asked for in the complaint.

### ADDENDUM

On January 11, 1965, Dorothy Fay Duffy, surviving sister of Helen Duffy Wharton, moved the court "for further trial" for the purpose of broadening the issues considered at the trial. For the reasons stated hereinabove with respect to the motion of United Services Automobile Association, motion of Dorothy Fay Duffy is denied.