**Nolvert P. SCOTT, Jr., Appellant, etc.**

v.

**The UNIVERSITY OF DELAWARE et al.**

No. 78–2365.

United States Court of Appeals, Third Circuit.

Argued April 2, 1979.

Decided June 6, 1979.

---

Bader, Dorsey & Kreshtool, John S. Grady (argued), Thomas Stephen Neuberger, Wilmington, Del., for plaintiff-appellant.

Potter, Anderson & Corroon, John P. Sinclair, Wilmington, Del., argued, for defendants-appellees.

Nathaniel R. Jones, James I. Meyerson, N.A.A.C.P., New York City, for N.A.A.C.P. (amicus curiae).

Robert E. Williams, Douglas S. McDowell, McGuiness & Williams, Washington, D.C., for Equal Employment Advisory Council (amicus curiae); Frank C. Morris, Jr., Epstein, Becker, Borsody & Green, Washington, D.C., of counsel.

Before ADAMS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

Dr. Nolvert P. Scott, Jr., a black former assistant professor at the University of Delaware, contended that the University discriminated on the basis of race in the hiring and promotion of its faculty members. He brought this action in the district court alleging claims under Title VII and the Civil Rights Acts of 1866 and 1871. Scott sought relief on his individual claims and on the claims of a class consisting of prospective faculty members who might be discriminated against by the University's hiring practices and current faculty members subject to discrimination by the University's contract renewal, promotion, and tenure practices. The district court, after certifying the class action, found against Scott on both his individual and class claims. The issues before the district court are now presented to us on appeal.

We conclude that the district court properly ruled against Scott on his individual

claims. With respect to the class claims, we hold that the class action should have been decertified, and thus do not reach the merits of the class action.

## I. BACKGROUND.

Dr. Scott, who had only recently received his doctoral degree in sociology, was appointed an assistant professor in the University's Sociology Department in September, 1971. His previous experience included eight years of teaching at a Canadian University and three years as a part-time graduate teaching assistant at Pennsylvania State University. During negotiations for his appointment to the Sociology Department, he requested and received from the University a salary commitment of $15,000 during the first year of his three year contract. This was $3,000 above the rate at which the University normally compensated new faculty members in the Sociology Department who possessed doctoral degrees.

When new faculty members were appointed to the Sociology Department, they were provided with a mimeographed brochure describing the personnel policies of the department. This brochure, originally published in 1969, described the criteria that would be considered in contract renewal, promotion, and tenure decisions: [1]

> The criteria fall into three general categories: 1) teaching effort and effectiveness, 2) scholarly activity, and 3) service to the department, the University, the community. Criteria in all three categories will be considered in formulating a recommendation.

The brochure thus served to inform new faculty members of the basic criteria that would be considered in contract renewal decisions.

During his discussions with the sociology faculty, Scott was informed that it was the general practice of the Department to evaluate candidates for contract renewal at the end of the second year of their three year contract. In this way, a candidate would receive one year's notice in the event his or her contract was not to be renewed. On May 1, 1973, the Sociology Department faculty met and reviewed Scott's performance, but concluded that Scott had produced inadequate evidence of research activity to permit a thorough evaluation of his work. As a consequence, Scott was asked to submit additional materials regarding his scholarly activities. On May 3, 1973, those members of the faculty in the Department who were senior to Scott met and, on the basis of Scott's supplemented record, recommended that his contract not be renewed. On May 8, 1973, the full Sociology Department met and voted against renewal 9 to 1, with 2 abstentions. Accordingly, Scott's employment with the University was terminated when his contract expired after the 1973–74 academic year. Scott then commenced this legal action. It was reported to this court at the time of oral argument on this appeal that on March 31, 1979, Dr. Scott had died.

## II. SCOTT'S INDIVIDUAL CLAIMS.

 Scott alleged individual claims of discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Acts of 1866, 42 U.S.C. § 1981, and 1871, 42 U.S.C. § 1983. With respect to each of these claims Scott proceeded in the district court on a "disparate treatment" theory, contending that he was purposefully treated less favorably by the University than similarly situated white faculty members. Both in the district court and on appeal, the parties have proceeded under the assumption that the substantive scope of liability under each of the Civil Rights Acts is the same with respect to Scott's individual claims of discrimination. Since the case has been presented to us in these terms, we will assume without deciding that this reflects a proper interpretation of these statutes.[2]

---

1. Department of Sociology Personnel Policy, Defense Exhibit 8.

2. The causes of action under each of the Civil Rights Acts are distinct and independent, and have different procedural, jurisdictional, and remedial characteristics. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); B. Schlei & P. Grossman, Employment Discrimination Law

■ The parameters of a disparate treatment theory in the context of an individual Title VII action were described by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (footnote omitted):

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

Once the plaintiff establishes such a prima facie case, "[t]he burden must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the employer produces evidence which satisfies this burden, the individual plaintiff must then be presented with "a fair opportunity to show that [the employer's] stated reason for [the individual plaintiff's] rejection was in fact pretext." *Id.* at 803, 93 S.Ct. at 1824. *Accord, Furnco Construction Corporation v. Waters*, 438 U.S. 567, 575–78, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).[3]

■ In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court expressed what was only implicit in *McDonnell Douglas*—that proof of discriminatory motive is required in a disparate treatment action. This disparate treatment theory of discrimination was explained as follows:

> "Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. See, e.g., *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265–266, [97 S.Ct. 555, 563–565, 50 L.Ed.2d 450].

*Id.* at 335 n.15, 97 S.Ct. at 1854.

The citation to *Arlington Heights* suggests that the motive requirement in dispa-

---

635–39 (1976). Also, different groups of persons are protected against discrimination under these various statutes. *See* B. Schlei & P. Grossman, *supra*, at 599–629.

In *New York City Transit Authority v. Beazer*, —— U.S. ——, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979) a case which upheld against Title VII and equal protection challenges a regulation of the Transit Authority prohibiting the employment of methadone users, the Supreme Court described the relationship between Title VII and § 1981 as follows:

> ". . . our treatment of the Title VII claim also disposes of the § 1981 claim without need for a remand. Although the exact applicability of that provision has not been decided by this Court, it seems clear that it affords no greater substantive protection than Title VII." *Id.* ——, 99 S.Ct. at 1364 n.24.

Lower federal courts have generally concluded that the substantive scope of liability under § 1981 in an individual employment discrimination action is congruent with that under Title VII. *See Sabol v. Snyder*, 524 F.2d 1009, 1012 (10th Cir. 1975); *Long v. Ford Motor Co.*, 496 F.2d 500, 505 n.11 (6th Cir. 1974) (order and allocation of proof); *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1281 n.3 (7th Cir. 1977).

Section 1983 requires that Scott prove that he has been deprived of a right "secured by the Constitution and [the] laws" of the United States, and that the University deprived him of this right while acting "under color of any statute" of Delaware. *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 155–56, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). It is conceded that the University and its officials are state actors for purposes of § 1983 liability. The only federal rights independent of § 1983 which Scott has identified on this appeal are those which he possesses under § 1981 and Title VII.

3. This theory of Title VII liability has been applied to unlawful discharge cases as well as refusal to hire cases. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277 (7th Cir. 1977); *Garrett v. Mobil Oil Corp.*, 531 F.2d 892 (8th Cir.), *cert. denied*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976); *Potter v. Goodwill Industries*, 518 F.2d 864 (6th Cir. 1975).

rate treatment cases is similar to that prevailing in equal protection analysis. *See generally* The Supreme Court, 1976 Term, 91 Harv.L.Rev. 70, 163 (1977).

In order to establish his disparate treatment claim, Scott presented evidence concerning the University's contract renewal and promotion practices with respect to other members of the faculty. He also presented evidence of individual instances of discrimination against him by members of the University community. Scott contended that this evidence demonstrated the University's discriminatory behavior in that other members of the faculty were granted contract renewals or promotions despite performance in the areas of teaching, scholarship, and community service which was comparable or inferior to his own. After a careful analysis of this evidence and of the facts surrounding the decision not to renew Scott's contract,[4] the district court concluded, essentially on two grounds, that Scott had failed to establish a prima facie case. First, the district court found that the nonrenewal of Scott's contract was not motivated by any racial animus, but "resulted from the opinion of nine members of the Sociology Department that [Scott] was not, and would not develop into, an acceptable permanent professional colleague."[5] Second, the district court found that Scott was not similarly situated to those whom he alleges received preferential treatment, and that Scott's evidence concerning the University's treatment of other faculty members did not indicate racial discrimination.[6]

Members of the sociology department testified at trial that although Scott's rating in connection with service to the community was high, he had not developed the high performance levels in the areas of scholarship and teaching that would justify contract renewal. The evidence indicated that Scott had not established a satisfactory record of publication in professional journals and that his teaching effectiveness, despite his previous extensive teaching experience, was criticized by both faculty members and students.

Scott's claim that he was comparable to other faculty members who received preferential treatment was undermined by evidence indicating that those other faculty members lacked his previous teaching experience and that the contract renewal and promotion criteria employed in other departments differed somewhat from those used in the Sociology Department. Moreover, many faculty members with whom Scott compared himself had accepted positions at the University prior to 1967, the year in which the University changed its employment policies to emphasize scholarship as a primary criterion in faculty hiring, renewal, and promotions. The University simply provided these faculty members with an opportunity to prove themselves under the new criteria; when they failed to do so, they were terminated. Scott, in contrast, was fully apprised of the relevant evaluation criteria shortly after he assumed his position at the University. Based on this evidence the district court found that Scott was not similarly situated to other faculty members and that the nonrenewal of his contract was motivated not by racial considerations but by a general view "that Scott was not the kind of 'sociologist's sociologist' the department was looking for."[7]

Our review of the record satisfies us that the evidence supports the district court's findings of fact, and that these findings are not clearly erroneous. *See Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972) (clearly erroneous standard or review of factfindings in non-jury civil cases). We therefore affirm the entry of judgment against Scott on his individual claims under Title VII, § 1981, and § 1983.[8]

4. The facts pertaining to Scott's employment at the University are ably set forth in detail in the opinion of the district court, 455 F.Supp. 1102 (D.Del.1978), and will not be repeated here.

5. 455 F.Supp. at 1120–21.

6. *Id.* at 1122–23.

7. *Id.* at 1121.

8. Insofar as Scott sought injunctive and declaratory relief compelling the University to reinstate him and renew his contract, these claims

III. CLASS CLAIMS.

A. *The District Court's Class Certification Order.*

In addition to his individual claims, Scott sought certification of a class composed "of all blacks who have been or will be discriminated against on the basis of race and color in hiring, firing, recruitment, promotion, supervision, wages, terms, conditions and privileges of employment by defendants." [9] He alleged that the Rule 23(a) prerequisites for class certification were satisfied, including the assertion that the class was so numerous as to render joinder of all members impracticable. On September 29, 1975, the district court, over the University's objection, certified the class requested by Scott.[10] For purposes of trial, however, two subclasses were informally recognized by the district court: "a class which includes blacks who allegedly have been or will be discriminated against in recruitment and hiring," [11] and a class of black University faculty members who have been discriminated against in the terms and conditions of their employment. With respect to both subclasses, the district court concluded that class treatment was appropriate under Rule 23(b)(2) because injunctive or declaratory relief was sought with respect to the class certified as a whole.

Both in the district court and now on appeal, the University has contested the correctness of the district court's class certification. This attack is concentrated on Scott's alleged failure to satisfy the prerequisites for class maintenance set forth in Rule 23(a). Scott, in turn, contends that the class certification issue is not properly before us for review and, alternatively, that the class was properly certified. Accordingly, we first turn to the reviewability of the class certification issue.

B. *Reviewability of Class Certification Order.*

■ Scott contends that the propriety of the class certification is not properly before us for review because the University has failed to take a cross-appeal.[12] For several

have been mooted by Scott's death. We address the merits of Scott's individual claims because the claim for back pay and damages survives his death. Although compensatory and punitive damages are generally not recoverable under Title VII, *see* B. Schlei and P. Grossman, Employment Discrimination Law 258–59 (1976), Scott, if he prevailed on his individual claims, might be entitled to back pay until the time of his death. *See Hodgson v. Ideal Corrugated Box Co.*, 10 FEP Cases 744, 752–53 (N.D.W.Va.1974).

Compensatory and, in certain circumstances, punitive damages are available under § 1981 and § 1983. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Basista v. Weir*, 340 F.2d 74 (3d Cir. 1965). Because neither § 1981 nor § 1983 specifies whether a cause of action under that statute survives the death of the plaintiff, the federal courts seek guidance from state survival acts provided they are not inconsistent with the policies underlying the federal statutes. *See Brazier v. Cherry*, 293 F.2d 401 (5th Cir.), *cert. denied*, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961); *Pritchard v. Smith*, 289 F.2d 153 (8th Cir. 1961). The Delaware survival statute, set forth at Del. Code Ann., Chapt. 10, §§ 3701–08, would permit the continuation of an action for damages.

9. Amended Complaint, App. 7a.

10. Order of September 29, 1975, App. 26a–27a. After limited discovery had been conducted, the University moved to decertify the action as a class action on the ground that Scott had failed to identify any black faculty members other than himself who were discriminated against by the University. The district court denied this motion for substantially the same reasons that it had granted the class certification motion initially. *See* 16 FEP Cases 737 (D.Del.1976) (opinion denying decertification motion).

11. 68 F.R.D. 606, 608 (D.Del.1975).

12. The necessity for a cross-appeal was described by Justice Brandeis in *United States v. American Railway Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924):

It is true that a party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought here by the appeal of the adverse party. In other words, the appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below. But it is likewise settled that the appellee may, without taking a cross-appeal, urge in support of a decree

reasons, we are unpersuaded by his argument. The failure to file a cross-appeal does not affect our power to consider the class certification issue. *See Rhoads v. Ford Motor Co.*, 514 F.2d 931, 934 (3d Cir. 1975); *Chicago, Burlington & Quincy R.R. Co. v. Ready Mixed Concrete Co.*, 487 F.2d 1263, 1268 n.5 (8th Cir. 1973); *Arnold's Hofbrau, Inc. v. George Hyman Construction Co., Inc.*, 156 U.S.App.D.C. 253, 258, 480 F.2d 1145, 1150 (1973); *Tug Raven v. Trexler*, 419 F.2d 536, 548 (4th Cir. 1969), *cert. denied*, 398 U.S. 938, 90 S.Ct. 1843, 26 L.Ed.2d 271 (1970); 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3904 (1976); 9 J. Moore, B. Ward & J. Lucas, Moore's Federal Practice ¶ 204.-11[5] (2d ed. 1975). This requirement has been described as a "rule of practice," *Tug Raven v. Trexler*, 419 F.2d at 548, rather than a jurisdictional restriction on federal appellate courts. Although generally we restrict the exercise of our appellate jurisdiction to occasions in which a formal cross-appeal has been filed,[13] in cases such as this, we are not mandated to do so. *See United States v. United States Steel Corporation*, 520 F.2d 1043, 1052 (5th Cir. 1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976).

In this case, the alignment of the parties makes it particularly inappropriate that we deny review of the class certification. Here, it is the absent class members who will be harmed by the effect of the district court's judgment in favor of the University on the merits of the class claims. These absentees, however, cannot be expected to be represented adequately by the University, the party that is perforce assigned to challenge the class certification. Nor can it be assumed that they will be represented adequately or effectively by the named class representative—the party that sought class certification—when the propriety of the class certification is challenged on grounds suggesting inadequate representation. In this circumstance, "there remains a duty upon the court to consider carefully the requirement of fair and adequate protection in view of the serious consequences of *res judicata* in class actions." *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 311 (6th Cir. 1975), *vacated and remanded on other grounds*, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977). The record here reveals apparent deficiencies in the satisfaction of the Rule 23(a) requirements for class certification, deficiencies which militate strongly against certification of the class. If the University's failure to file a cross-appeal were permitted to control our review of the certification issue, we would be abdicating our responsibility to absent class members.[13a]

In this case, therefore, we follow the practice established in *Rhoads v. Ford Motor Company*, 514 F.2d at 934, where Judge Aldisert wrote:

> any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it. *See Washington v. Confederated Bands and Tribes*, 439 U.S. 463, 476, 99 S.Ct. 740, 749 n.20, 58 L.Ed.2d 740 (1979). Since the University prevailed upon the merits of the class claims in the district court, its attack upon the class certification on appeal will not enlarge its own rights or lessen those of its adversary. Rather, our conclusion that the class was improperly certified will cause the University to forfeit whatever preclusion effects it may have derived from the district court's judgment on the class claims. This fact, as well as the party structure of the lawsuit, makes it appropriate for us to review the district court's class certification despite the absence of a cross-appeal.

**13.** *See County of Los Angeles v. Davis*, —— U.S. ——, 99 S.Ct. 1379, 1382 n.3, 59 L.Ed.2d

642 (1979); *Joseph v. Norman's Health Club, Inc.*, 532 F.2d 86, 88 n.2 (8th Cir. 1976). We think that the discussion in these cases was addressed only to the discretion, and not the power, of the court in declining to consider a class certification issue not raised in a cross-appeal.

**13a.** While there may be cases, such as this one, in which it is "just under the circumstances", 28 U.S.C. § 2106, to adjure the requirement of a cross-appeal, we are not convinced that Judge Adams' analysis in his concurring opinion is a salutary one for all cases. His analysis would in all cases dilute the benefits of a cross-appeal requirement—adequate notice and a sharp framing of the issues on appeal—even though it is the appellee who controls the strategic decision of whether to challenge the class certification on appeal, as it did here.

While better practice would have dictated that Rhoads file a protective cross-appeal, in these circumstances we will not allow his failure to file a notice of appeal to preclude our review of the record. In this respect, we follow the rule we recently invoked in a modified context: once appellate jurisdiction attaches, " 'the power of the court of appeals should be plenary to the extent that it chooses to exercise it. A court should not close its eyes to what is plainly there.' " *McCreary Tire & Rubber Co. v. CEAT S.p.A.*, 501 F.2d 1032, 1038 (3 Cir. 1974), quoting 9 J. Moore, Federal Practice ¶ 110.25[1], at 273 (2d ed. 1973).

With these considerations in mind, we next turn to the propriety of the district court's actions in certifying the class action and in then refusing to decertify it in light of the facts developed at trial.

### C. Merits of the Class Certification Order.

The University contends that Scott failed to satisfy the numerosity, commonality, and typicality prerequisites to class certification set forth in Rule 23(a).[14] No point is made on appeal concerning the district court's conclusion that the requirements of Rule 23(b)(2) were satisfied in this case. Accordingly, we will focus our attention on the prerequisites for class treatment set forth in Rule 23(a).[15] This subdivision states that class certification is proper only if "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R. Civ.Proc. 23(a).[16]

The subdivision (a) prerequisites to class certification perform two principal functions. By requiring the existence of common questions of law or fact and the impracticability of joinder, a threshold standard as to the appropriateness of class treatment is established. The requirements of commonality, typicality, and adequacy of protection afforded the interests of unnamed class members, in turn, all assure that the interests of absent class members will be adequately represented by the named class representatives.[17] Adequate representation, in addition to being re-

14. The scope of review of a district court's determination as to whether the prerequisites for class treatment set forth in Rule 23(a) have been satisfied was described in *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 756 (3d Cir.) (*en banc*), *cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974), as follows:

The district court must determine if the four prerequisites for a class action listed in rule 23(a) have been met. These are mandatory requirements, and our review decides whether the mandates have been met.

*Accord, Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 245 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). If the district court has properly applied the mandatory criteria of Rule 23, we must then determine whether the approval or denial of class certification constituted an abuse of discretion. *See Bogus v. American Speech & Hearing Ass'n*, 582 F.2d 277, 289–90 (3d Cir. 1978); *Paton v. La Prade*, 524 F.2d 862, 875 (3d Cir. 1975).

15. This is not to say that the subdivision (b) ruling is entirely irrelevant to a court's assessment as to whether the subdivision (a) prerequisites have been satisfied. In a subdivision (b)(2) action in which the primary justification for class certification is simply judicial economy, a court must be concerned with the interests of absent class members because they have not received individual notice.

16. A class action may be maintained if, in addition to the prerequisites of Rule 23(a), one of the categories of Rule 23(b) is also satisfied.

17. In *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975), this court described the adequacy of representation doctrine as follows:

Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.

No suggestion has been made that Scott's counsel was not fully competent to handle this litigation. The case was well argued and briefed on appeal, and we do not rest our holding in any way on the quality of Scott's legal representation.

quired by Rule 23, is constitutionally mandated if absent class members are to be bound by the judgment concerning the class claims. *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). According to the University, the facts developed at trial disclosed that the Rule 23(a) prerequisites would not be satisfied by certification of either a class (or subclass) consisting of applicants seeking faculty positions or a class consisting of those who have obtained faculty status.[18]

### 1. *Applicant Class.*

Two basic objections are raised to Scott representing a subclass consisting of applicants seeking faculty positions who challenge the University's alleged discriminatory hiring practices. First, since Scott was a faculty member of the University at the time this lawsuit was commenced and since he personally does not complain of discrimination in his hiring, his claim against the University is not typical of those applicants who have sought or who may hereafter seek faculty positions. Second, Scott did not allege, and the evidence adduced at trial did not disclose, that any identified individuals were discriminated against by the Universi-

ty's hiring practices. The University contends that the applicant class which Scott sought to represent is nothing more than hypothetical and that the numerosity requirement is therefore unsatisfied.

When the interests of the named class representative and unnamed class members coincide, there is no question but that insofar as the claims are concerned the typicality requirement of subdivision (a) is satisfied. *See, e. g., In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322, 336 (E.D.Pa.1976); *Hernandez v. United Fire Insurance Co.*, 79 F.R.D. 419, 425 (N.D.Ill. 1978). That however, is not this case. Nor is our case one in which the interests of the named representative merely diverge from, but do not clearly conflict with, those of unnamed class members. Often such a divergence will be harmless in that it will not impair the incentive of the named representative in vigorously prosecuting all aspects of the case. *See Sullivan v. Chase Investment Services of Boston, Inc.*, 79 F.R.D. 246, 257–58 (N.D.Cal.1978); *Dolgow v. Anderson*, 43 F.R.D. 472, 494 (E.D.N.Y. 1968), *rev'd on other grounds*, 438 F.2d 825 (2d Cir. 1970).[19] Moreover, when notice to

---

**18.** Although the University contends that the district court erred in its initial certification of the class action, we need not resolve that issue on this appeal. Even if we were to assume that the initial certification was proper, we think that the facts that emerged in the course of trial demonstrated that the adequate representation and numerosity prerequisites were not satisfied, and that accordingly the class should have been decertified when that situation became apparent. *See Weisman v. MCA Inc.*, 45 F.R.D. 258, 260 n.1 (D.Del.1968) (court has obligation to proceed under Rule 23(c) even in the absence of a proper motion).

**19.** Recently, in *East Texas Motor Freight, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977), the Supreme Court stated that "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as class members." Standing alone, this language might suggest that class certification is always inappropriate when there are divergent interests between the named representative and absent class members. However, when read in context, it is evident that the Court did not intend to speak quite so broadly. The cases cited in support of the Court's statement did not concern the inter-

pretation of Rule 23, but rather concerned the standing of the named representative to bring the suit. If the named representative has suffered no injury in fact relative to the class claims, the named representative may lack standing because of the Article III case or controversy requirement. *But cf. Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (standing requirement satisfied by injury to entire class). Moreover, the Court in *East Texas Motor Freight* went on to suggest that there was an actual conflict of interests between the plaintiffs and the class they were certified as having represented. *See* 431 U.S. at 405, 97 S.Ct. 1891. Finally, the procedural posture of *East Texas Motor Freight* was *sui generis* since the court of appeals had certified the class after the district court had made findings indicating that the plaintiffs were not proper class representatives.

Based on these factors, we agree that "[t]he conflict between the permissive and the rigorous approaches to the Rule 23(a) prerequisites was not settled by the Supreme Court's treatment of 23(a) in *Rodriguez*." Note, Antidiscrimination Class Actions Under the Federal Rules of Civil Procedure: The Transformation of Rule 23(b)(2), 88 Yale L.J. 868, 882 (1979).

absentees is required, class members with divergent claims or strategies will be able to inform the court of their views. If necessary, the court may designate a number of class representatives, each advancing somewhat different theories of the case, and may establish subclasses to accommodate divergent views as the litigation proceeds. *See* Developments in the Law—Class Actions, 89 Harv.L.Rev. 1318, 1475–89 (1976). No mere divergence of interests is presented, however, by Scott's complaint. Rather, the case before us presents a clear conflict of interests between Scott, the named representative, and the unnamed members of the applicant subclass. These antagonistic interests leave no doubt that failure to decertify the class action was improper. *See Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 243 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

The record discloses that Scott was the sole named representative in this case, and that his interests as a faculty member whose contract was subject to renewal were necessarily in conflict with those of applicants for positions on the University faculty. Scott had received an appointment to the University faculty, and held a doctor of philosophy degree when he assumed his position. Moreover, he received a premium over the salary normally paid by the University. Understandably, in view of these facts, he could not, and does not, claim that he was discriminated against by the University's hiring policies. Despite these facts, Scott seeks to lead a challenge against the same University hiring policies which resulted in his employment. Moreover, in so doing, he disputes the validity of the University's requirement of a doctoral degree as a primary hiring criterion. He thus attacks, via the applicant class, the very degree which he possesses and which he asserts in his own favor in seeking relief on his individual disparate treatment claim. The assertion of these inconsistent positions necessarily forecloses any contention that Scott's claims are typical of the claims of those applying for faculty positions. Under these circumstances, it cannot be said that Scott was an adequate representative of the unnamed members of a class seeking employment.[20] This being so, the prerequisites for certification of such a class were not satisfied.[21]

*East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), provides strong support

---

*See generally* Miller, Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem," 92 Harv.L.Rev. 664 (1979).

**20.** *See Bolden v. Pennsylvania State Police,* 578 F.2d 912, 924 (3d Cir. 1978) (Garth, J., concurring in part and dissenting in part) (Rule 24(a) intervention should be permitted for nonminority applicant class because their interests were inadequately protected by the Fraternal Order of Police, representing current police officers, in seeking modification of Consent Decree. " . . . FOP and the present police officers have a much stronger and more direct interest in the *promotion* features of the Consent Decree, rather than the *hiring* features with which the applicants are primarily concerned.").

**21.** We recognize that in *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975), the court permitted former employees of Liberty Mutual to represent a class challenging Liberty Mutual's hiring and promotion policies. Although we agree with the legal standard of adequate representation announced in *Wetzel, see* note 17 *supra,* we find that case factually inapposite to Scott's appeal. In that case, Liberty Mutual objected to the class certification on the ground that the *former employees,* "who have voluntarily severed their employment prior to suit cannot adequately represent members of the class who are *presently employed* by the company." 508 F.2d at 247. (emphasis supplied). Liberty Mutual never raised, and the court apparently never considered, the issue of whether *current employees* can represent a class of *prospective employees.* Certainly the interests of the former employees in *Wetzel,* who had voluntarily left their employment, would not be adversely affected by potential competition from prospective employees. Scott, in contrast, would have been in sharp competition for contract renewal and tenure with applicants who might be offered faculty positions. The flavor of this competition is suggested by Scott's having successfully negotiated for a salary higher than that usually paid by the University, and by his having argued against a Ph.D. requirement on behalf of the applicant class but having emphasized his own Ph.D. in support of his individual claims.

for the result which we reach here. The Supreme Court there held that the court of appeals erred in certifying *on appeal* a discrimination action for class treatment since "it was evident by the time the case reached that court that the named plaintiffs were not proper class representatives under Fed.Rule Civ.Proc. 23(a)." *Id.* at 403, 97 S.Ct. at 1896.[22] They were not proper class representatives because the district court found that the plaintiffs lacked the qualifications to be hired for the positions which they sought. "Thus, they could have suffered no injury as a result of the alleged discriminatory practices, and they were, therefore, simply not eligible to represent a class of persons who did allegedly suffer injury." *Id.* at 403–04, 97 S.Ct. at 1897.

Moreover, the Court noted that the named plaintiffs had failed to move for class certification in the district court, and that they were demanding certain forms of relief in conflict with the views expressed by members of the class they sought to represent. *See id.* at 404–05, 97 S.Ct. 1891.

Similarly, in this case, Scott concedes that he personally suffered no discrimination when he was hired. Since he was not injured by any alleged discriminatory hiring practices, it is doubtful after *East Texas Motor Freight* that he can lead a class challenging the University's hiring practices.[23] Furthermore, Scott's attack on the University's hiring practices was in crucial respects in conflict with his individual claims. The existence of this conflict

---

**22.** In *East Texas Motor Freight,* the Supreme Court recognized that the point in a trial at which a class certification issue is adjudicated will have some influence on an appellate court's review of the decision on that issue. The Court expressed this understanding as follows:

> Obviously, a different case would be presented if the District Court had certified a class and only later had it appeared that the named plaintiffs were not class members or were otherwise inappropriate class representatives. In such a case, the class claims would have already been tried, and, provided the initial certification was proper and decertification not appropriate, the claims of the class members would not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims. See, e.g., *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 752–757 [96 S.Ct. 1251, 47 L.Ed.2d 444]; *Moss v. Lane Co.,* 471 F.2d 853, 855–856 (CA4). Where no class has been certified, however, and the class claims remain to be tried, the decision whether the named plaintiffs should represent a class is appropriately made on the full record, including the facts developed at the trial of the plaintiffs' individual claims. At that point, as the Court of Appeals recognized in this case, "there [are] involved none of the imponderables that make the [class action] decision so difficult early in litigation." 505 F.2d at 51. See also *Cox v. Babcock & Wilcox Co.,* 471 F.2d 13, 15–16 (CA4).

431 U.S. at 406 n.12, 97 S.Ct. at 1898.

This analysis suggests that if a district court's initial certification order was proper in view of the limited facts before the court at the time of its ruling, the subsequent development of facts at trial undermining this order may merely result in harmless error if there is nonetheless a full and fair presentation at trial of the claims of the class. Conversely, if it appears that there was not a full and fair presentation of the class claims at trial, as might be suggested if those claims were denied, then any error in the initial certification would not be harmless. Thus, even if we were to assume that the initial certification order was proper, *see* Note 18, *supra,* we would conclude that the district court erred in refusing to decertify this case as a class action. This error was not harmless in view of the conflict between Scott's individual claims and those of the applicant class.

**23.** Several courts have held that a named plaintiff who challenges a defendant's discriminatory *promotion* practices may not represent a class contesting the defendant's *hiring* practices because these claims are insufficiently similar. *See Hill v. Western Electric Co., Inc.,* 596 F.2d 99 (4th Cir. 1979); *Chavez v. Tempe Union High School Dist. # 213,* 565 F.2d 1087, 1094 n.10 (9th Cir. 1977); *United States v. School Bd. of City of Suffolk,* 418 F.Supp. 639 (E.D.Va.1976), *aff'd in part and rev'd in part on other grounds sub nom., Walston v. School Bd. of City of Suffolk,* 566 F.2d 1201 (4th Cir. 1977); *Greene v. Brown,* 451 F.Supp. 1266 (E.D.Va.1978). *See also Walker v. World Tire Corp., Inc.,* 563 F.2d 918 (8th Cir. 1977); *Satterwhite v. City of Greenville,* 578 F.2d 987, 991–92 (5th Cir. 1978) (en banc), *petition for cert. filed,* 47 U.S.L.W. 3465 (U.S. Jan. 9, 1979) (No. 78–1008); *Tuft v. McDonnell Douglas Corp.,* 581 F.2d 1304 (8th Cir. 1978). *But cf. Dickerson v. United States Steel Corp.,* 439 F.Supp. 55, 61–62 (E.D.Pa.1977) (*Rodriguez* does not preclude "across-the-board" class certification in antidiscrimination action).

makes this case an even stronger one than *East Texas Motor Freight* for denying class treatment, and impels us to hold that the district court erred in refusing to decertify the applicant class with Scott as its named representative once this conflict became apparent.[24]

### 2. *Faculty Class.*

In addition to the subclass of applicants for faculty positions at the University, the district court's class certification order included a subclass of all faculty members who have been or in the future will be discriminated against on racial grounds with respect to the University's contract renewal, promotion, and tenure policies. The University contends, however, that decertification was required with respect to this subclass because the Rule 23(a) numerosity requirement was not satisfied.

▪ The numerosity requirement was designed " 'to prevent members of a small class from being unnecessarily deprived of their rights without a day in court' by the opposing party or by only a few members of the class resorting to Rule 23." 7 C. Wright & A. Miller, Federal Practice and Procedure § 1762 at 593 (1972). It also fosters the interest of the court in assuring a full and fair exposition of views by all affected parties when it is practicable to join them in a single proceeding. These beneficial objectives are undermined, however, by the facile conclusion that the numerosity requirement may always be satisfied in antidis-

crimination class actions because there exist unidentified future class members who may suffer discrimination.[25] We cannot ignore the possibility that "the framing of overbroad classes may result in the loss of claims of absent members which, had the class been appropriately framed, might well have been successfully asserted." *Harriss v. Pan American World Airways, Inc.,* 74 F.R.D. 24, 43 (N.D.Cal.1977).

The findings of fact made by the district court in this case reveal that only a small number of black faculty members had been subjected to the University's employment practices. With respect to promotions and tenure, the district court made the following findings:

Of the twelve black full time faculty at the time of trial, two were tenured and two were on the verge of being tenured. Of the remaining eight black faculty members, only four had been on the faculty for three years. Of these four, Gregory and Miles had only Bachelor's degrees, and Farrow and Washington had only Master's degrees. Thus, every black faculty member with a doctorate and with three or more years of service at the University was tenured or near tenure. The only other black faculty members who have stayed at the University for more than three years in the past were Hilda Davis, a Ph.D. in Sociology, who had a special function in the Writing Center of the English Department, and Mary Farrell, who had only a Master's degree, and who was recommended for

---

**24.** Because we rest our holding on the ground that Scott could not be an adequate representative of the applicant subclass, we do not reach the issue of whether the numerosity requirement was satisfied with respect to that subclass.

**25.** *See EWH v. Monarch Wine Co. Inc.,* 73 F.R.D. 131, 133 (E.D.N.Y.1977); *Piva v. Xerox Corp.,* 70 F.R.D. 378, 388 (N.D.Cal.1975). *Cf. Committee to Free the Fort Dix 38 v. Collins,* 429 F.2d 807, 812 (3d Cir. 1970) (class certification improper when "[n]owhere in the complaint are any persons other than the appellants themselves specified as being within the class affected").

In *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3d Cir.), *cert. denied,* 421 U.S.

1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975), this court held that future class members could properly be included in the class certification under subdivision (b)(2). *Id.* at 254. Future class members were not expressly considered by the court, however, in its discussion of whether the numerosity requirement of subdivision (a)(1) was satisfied. Instead, the court focused on the number of persons who would *presently* fall within the class. *Id.* at 246–47. At least by negative implication, this part of the court's opinion can be read in support of the position that future class members are not to be counted or relied upon for purposes of complying with the numerosity requirement of subdivision (a)(1).

promotion (though not tenure) when she left the University in 1974. In addition, the University has attempted to hire Doctors Eubanks and Colson into tenured positions on its faculty.

The record on promotions is too sketchy to draw any inference. All we know is that there were some promotions of black faculty and that the EEOC found that two of the three blacks who became eligible for promotion between 1972 and 1975 were promoted.

455 F.Supp. at 1131–32 (footnotes omitted).

The evidence pertaining to contract renewals suggests an even smaller number of black persons affected:

Finally, with respect to renewals; there is no evidence of any black faculty member other than Dr. Scott who has not had his contract renewed. Indeed, no faculty member other than Dr. Scott is identified in the record as one claiming to be a victim of any racial discrimination in renewal, promotion or tenure at the University.

*Id.* at 1132.

■ In view of the district court's findings, we must conclude, on the facts of this case, that the numerosity requirement for class certification was not satisfied with respect to the faculty subclass. Scott has not identified a single past or present faculty member, other than himself, who was arguably discriminated against by the University's contract renewal, promotion, and tenure practices. Moreover, the number of black faculty members at the University who may have been subject to such discrimination is not so large as to make joinder impracticable. *See Kelley v. Norfolk and Western Railway Co.,* 584 F.2d 34 (4th Cir. 1978). Furthermore, no suggestion has been made that any past or current members of the faculty who may feel that they have been discriminated against are in any way disabled from maintaining an antidiscrimination action on their own behalf.

Against this background concerning past and current faculty members, we do not think the mere allegation that *future* faculty members may be discriminated against is sufficient to satisfy the numerosity requirement. The class of future faculty members is simply ephemeral on the facts of this case—it is constructed on the hypothesis that the University will hire blacks for faculty positions and then discriminate against them by refusing to renew employment contracts or by denying promotion or tenure solely on the basis of race. Scott has introduced no evidence which would support this hypothesis. In such a circumstance, we do not think that future faculty members, whose possible claims are only speculative and can only be formulated in a highly abstract and conclusory fashion, should provide, and possibly be prejudiced by, membership in the class which Scott seeks to represent. For these reasons, we hold that the numerosity requirement of Rule 23(a) was not satisfied with respect to the faculty subclass, and that this subclass should have been decertified when this circumstance became apparent.

## IV. CONCLUSION:

The final judgment of the district court dated August 16, 1978 provided that "judgment is entered for the defendants and against the plaintiff."

We will affirm so much of that final judgment entered in favor of the defendants as pertains to Scott's individual disparate treatment claims.

Because we have concluded that the district court erred in refusing to decertify Scott's class action, we will vacate so much of the final judgment as pertains to the class action. In accordance therewith, we will remand to the district court with instructions that an order be entered decertifying the class action and dismissing without prejudice all of the class action claims asserted by Scott, thereby disposing of all claims presented in this action.

ADAMS, Circuit Judge, concurring.

Although I concur in the judgment of the Court, I write separately for two reasons. First, I believe my views on the necessity of filing a cross-appeal differ from those set

forth in the majority opinion. Second, I consider it important to underscore what I understand to be the limited scope of our holding regarding class certification.

## I. NECESSITY OF FILING A CROSS–APPEAL

The appellate process is triggered by the relatively simple, yet mandatory mechanism of the filing of a notice of appeal which designates the judgment, order, or part thereof, that the appellant seeks to have overturned. The appellee, of course, need not subsequently cross-appeal in order to defend the judgment in his favor. In fact, as Justice Cardozo noted, it is an "inveterate and certain" rule that an appellee may, without filing a cross-appeal, " 'urge in support of a decree any matter appearing in the record although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.' "[1] Apart from a number of practical considerations,[2] this rule reflects "the notion that a person who is satisfied with the action of a court should not have to appeal from it, no matter what his adversary does."[3] Furthermore, as commentators have observed, a contrary practice could ofttime present "the paradoxical situation of requiring a cross-appeal under circumstances which would seem not to permit a direct appeal."[4]

The rationale underlying the general rule also provides a basis for assessing when a cross-appeal is necessary. Thus, for example, and of relevance here, "what [an appellee] may not do in the absence of a cross-appeal is to 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below.' "[5]

In the present case, brought by "Nolvert P. Scott, Jr., individually and on behalf of all other persons similarly situated," final judgment was "entered for the defendants and against the plaintiff."[6] Although the University had opposed certification of the class, it was required to litigate both the individual and the class claims in an extended trial, at which it ultimately prevailed. The University of course, was pleased with this result, and had no occasion at the time the district court judgment was entered to seek appellate review of the prior interlocutory order that had certified the class, particularly since such review might jeopardize the *res judicata* effect of its hard-fought victory. When Scott filed an appeal, however, the University, as one of several possible grounds for preserving the judgment in its favor, tendered the argument that the class had been improperly certified. Desiring to protect the class certification from appellate scrutiny while he pressed his challenge to the district court's disposition of the class claims, Scott contended that review of the propriety of the certification of the class was precluded because the University had neglected to file a cross-appeal challenging the class certification.

The majority concludes that the class certification may be reviewed on appeal. Although it recognizes that in challenging the

---

1. *Morley Construction Co. v. Maryland Casualty Co.,* 300 U.S. 185, 191, 57 S.Ct. 325, 327, 328, 81 L.Ed. 593 (1937) (*quoting United States v. American Ry. Express Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087 (1924)). *See also Dandridge v. Williams,* 397 U.S. 471, 475–76 n.6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

2. For instance, because the substantive questions which the appellant plans to raise generally are not included in the notice of appeal, the appellee will often be unable to determine whether a cross-appeal is necessary to preserve an argument that he intends to make on his own behalf. *See generally* Stern, *When to*

*Cross-Appeal or Cross-Petition—Certainty or Confusion?,* 87 Harv.L.Rev. 763, 765–67 (1974).

3. *Id.* at 765.

4. *Id.* (quoting Note, *Cross-appeals in Maine: Pitfalls for the Winning Litigant,* 25 Maine L.Rev. 105, 113–14 (1973)).

5. *Morley Construction Co. v. Maryland Casualty Co.,* 300 U.S. 185, 191, 57 S.Ct. 325 (*quoting United States v. American Ry. Express Co.,* 265 U.S. 425, 435, 44 S.Ct. 560).

6. Final Judgment, August 16, 1978. App. at 161a.

class certification the University does not seek to enlarge its own rights or lessen those of its adversary,[7] however, its opinion appears not to regard this challenge as qualifying under the general rule that an appellee need not cross-appeal in order to advance an argument that had been rejected or ignored by the trial court but that supports the judgment in its favor. Instead, and quite importantly, the opinion assumes that ordinarily a court will decline to consider a class certification issue not raised by cross-appeal, and proceeds to assert that this "rule of practice" ought to be overlooked in the present case because otherwise the Court "would be abdicating [its] responsibility to absent class members."[8]

Somewhat troublesome, at least to me, is the suggestion by the majority that the result here comes about as a departure from the general rule. It is true, as a technical matter, that in raising the class certification issue the appellee may be seen as requesting not an affirmance on the merits but rather that the judgment of the trial court be vacated and the cause remanded with directions that the class action claim be dismissed. That should be of no consequence to the rule governing cross-appeals, however.[9] For, as already indicated above, it is evident that a prevailing party, such as the University here, is satisfied with the judgment and does not seek to have it modified to increase its rights or to lessen those of its adversary. In fact, it would prefer not to have the judgment disturbed at all, and merely raises the class certification issue to protect itself in the event that the favorable ruling it secured on the merits is overturned.[10] Inasmuch as the purpose for filing a notice of appeal or notice of a cross-appeal is to invoke appellate jurisdiction to review a judgment and to have the adversary notified that the judgment is being challenged,[11] I see no reason to require the appellee to file a cross-appeal in order to preserve a backup ground for protecting a judgment that has been rendered in its favor, when an appeal has already been filed from that judgment.

Moreover, it seems to be unfair to require that a cross-appeal be filed in order to secure review of the class certification decision, notwithstanding the fact that an appeal has been taken from the final judgment. Such a requirement would create a trap for the unsophisticated and unwary

7. *Supra*, at 82–83 n.12.

8. *Id.* at 83.

9. *Contra, Joseph v. Norman's Health Club, Inc.*, 532 F.2d 86, 88 n.2 (8 Cir. 1976) (no analysis provided). The Supreme Court recently appears to have been applying a more restrictive rule, under which it has refused to address arguments that would necessitate changing more of the judgment than is brought into issue by the initial appeal. *See Strunk v. United States*, 412 U.S. 434, 437, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973); *NLRB v. International Van Lines*, 409 U.S. 48, 52 & n.4, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972). *See also Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 381 n.4, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Under such an approach, a cross-appeal would be required for review of a class certification ruling. These recent cases, however, may be explained by the different considerations that bear upon the Supreme Court's review process and that limit it to questions of national importance on which certiorari has been granted. *See Stern, supra* note 2, at 777–79.

10. *Compare County of Los Angeles v. Davis*, —— U.S. ——, 99 S.Ct. 1379, 1382 n.3, 59 L.Ed.2d 642 (1979) (respondents contend that their failure to include past applicants in the class was a "mere oversight;" however, the Supreme Court will not *modify* judgment to correct this fatal error since no cross-petition was filed).

11. Contrary to the majority, I do not believe that a purpose of the cross-appeal requirement is "a sharp framing of the issues on appeal," *supra*, at 83 n.13a. The practice governing cross-appeals is controlled by the rules pertaining to appeals; under Fed.R.App.P. 3(c), a notice of appeal need designate only "the judgment, order or part thereof appealed from." A sample of such a notice is provided in Form 1 of the Appendix to the Rules, and leaves no doubt that the appellant or cross-appellant need not identify the points he intends to argue. That function, as well as a sharp framing of the issues, is properly accomplished by the various briefs. *See generally* Stern, *supra* note 2, at 756–66. The briefs on this appeal make it abundantly clear that the University squarely took issue with the class certification ruling, and that the plaintiffs had ample opportunity to respond in their reply brief.

attorney, who was assured that the class certification order would be reviewed if and when an appeal is filed from the final judgment, rather than immediately, as he undoubtedly would have preferred.[12] Such an appellee is likely to neglect to file a cross-appeal because he is satisfied with the ultimate outcome of the trial.

Finally, the course apparently charted by the majority would seem to be unwise, for it introduces a new element of uncertainty into a relatively settled area of the law.[13] It would force an appellee to file a cross-appeal whenever any doubt exists as to whether a court of appeals will consider arguments supporting the judgment in his favor, and, more significantly, would punish him for failing to do so. In addition, this approach may be criticized for widening the power of the judiciary to engage in unprincipled decisionmaking. This is so because it would expand the reach of a "rule of practice" requiring cross-appeals and then would selectively waive its application when any particular panel deems it to be in the interest of justice.

## II. CLASS CERTIFICATION

Turning to the class certification issue presented in this case, I am in basic agreement with the majority opinion on this subject, but consider it important to add two caveats.

First, it should be emphasized that we do not hold that the trial court committed reversible error when it certified the class at the outset of the litigation. Rule 23(c) directs the trial judge to determine "[a]s soon as practicable after the commencement of an action" whether it is to be maintained as a class action, but also permits the judge to modify his order before the decision on the merits. In keeping with that provision, the trial court ruled at a relatively early stage of the lawsuit that the allegations set forth in Scott's complaint may warrant class action treatment. The judge was cognizant of the possibility that Scott might ultimately fail to satisfy the numerosity or adequate representation requirements. However, he ascertained that the appropriate course was to certify the class, subject to reexamination if subsequently developed facts cast doubt on the propriety of that ruling.[14] This initial decision was, in my view, neither erroneous as a matter of law nor an abuse of discretion.[15] Rather, as the majority makes clear, the facts that emerged in the course of the trial demonstrated that the numerosity and adequate representation prerequisites were not satisfied, and accordingly, it was appropriate that the class be decertified when that situation became apparent.

Second, as I understand the majority opinion, it is not intended to represent a

12. It should be recalled that not too long ago virtually all routine avenues for obtaining immediate appellate review of an order certifying a class were foreclosed, thereby deferring review of class action rulings until after a final judgment is entered. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978); *Gardner v. Westinghouse Broadcasting Co.*, 437 U.S. 478, 98 S.Ct. 2451, 57 L.Ed.2d 364 (1978). Implicit in that development, at least to me, is the understanding that the entire record, including all interlocutory rulings (be they related to discovery, the introduction of evidence, or the certification of the class), will be open to scrutiny if and when an appeal is taken at the end of the case.

13. While the majority's reference to *Rhoads v. Ford Motor Co.*, 514 F.2d 931 (3d Cir. 1975), might be construed as suggesting that this Court has struck a different course from the traditional rule controlling cross-appeals, I do not regard the parenthetical remark in that case that "better practice would have dictated

that Rhoads file a protective cross-appeal," *id.* at 934, as intending such a departure, particularly since the Court was not focusing on that issue.

14. *Scott v. University of Delaware*, 68 F.R.D. 606 (D.Del.1975).

15. The practice has been for courts to construe the requirements of Rule 23 liberally, particularly when the determination of the propriety of the class action is being made at an early stage of the proceedings, and to modify the order as necessary to comport with subsequently developed facts. *Gerstle v. Continental Airlines, Inc.*, 50 F.R.D. 213 (D.Colo.1970). *See Green v. Wolf Corp.*, 406 F.2d 291, 298 & n.10 (2d Cir. 1968); *Cusick v. N. V. Nederlandsche Combinatie Voor Chemische Industrie*, 317 F.Supp. 1022, 1026 (E.D.Pa.1970); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1785 at 138 (1972).

constriction upon the availability of the class action device in suits charging "across the board" discriminatory employment practices. True, the Supreme Court admonished in *East Texas Motor Freight, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1898, 52 L.Ed.2d 153 (1977), that even though "suits alleging racial or ethnic discrimination are often by their very nature class suits, involving classwide wrongs[,] . . . careful attention to the requirements of Fed.Rule Civ.Proc. 23 remains nonetheless indispensable." But, like any indefinite standards, the Rule 23(a) prerequisites are themselves capable of being applied more strictly as well as less strictly. And, out of an emerging awareness that the class action device is expected to facilitate the realization of substantive objectives, courts have been molding class action practice so as best to effectuate the policies underlying the various causes of action.[16] Perhaps nowhere has this interrelationship between procedure and substance been more visible than in the context of class action suits challenging racial discrimination in employment,[17] a development that was foreseen by the drafters of the 1966 amendments to the Rule,[18] and is reflected in opinions of this Court.[19] As the majority observes in footnote 19 of its opinion, we fail to detect a disapprobation of this approach in *East Texas Motor Freight.* Nor, for that matter, do I regard the present decision as heralding a retrenchment by this Court in class action practice.

The determination that, under the circumstances here, Scott may not represent a class consisting of persons harmed by the University's allegedly discriminatory hiring practices, is not, as I see it, grounded on a restrictive notion of class representation. We do not hold that the class representative must stand in an identical position vis-à-vis his employer as the other class members, or that in general a person allegedly discriminated against with respect to promotion may not represent a class including individuals who were aggrieved by the employer's hiring practices. Indeed, in *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir. 1975), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1976), this Court held that a former employee, who was not entitled to reinstatement, may nonetheless attack allegedly discriminatory employment practices on behalf of a class of past and present employees. And in that case we permitted both hiring and promotion practices to be challenged by the same representatives. Here, however, we are motivated by a conviction that those persons who may have been discriminated against by the University's hiring practices, which make the possession of a Ph.D. degree or its equivalent a precondition to faculty employment, cannot be adequately represented by a person who was hired because he already possessed that degree and who, quite probably, is interested in preserving the benefits to which that degree entitles him. To quote the majority opinion, "[n]o mere divergence of interests is presented," but "a clear conflict of interests between Scott, the named representative, and the unnamed members of the applicant subclass."[20]

16. *See generally* Developments—Class Actions, 89 Harv.L.Rev. 1318, 1359–66 (1976).

17. *See generally* 7 C. Wright & A. Miller, Federal Practice and Procedure § 1771 (1972); Note, *Antidiscrimination Class Actions Under the Federal Rules of Civil Procedure: The Transformation of Rule* 23(b)(2), 88 Yale L.J. 868 (1979).

18. *See* Advisory Committee Note to the 1966 Amendment to Rule 23, *reprinted in* 39 F.R.D. 98, 102. The utility of the class action device as a vehicle for the bringing of suits alleging racial discrimination in employment was also anticipated by Congress. In spearheading Congress's rejection of the House version of Title VII, which would have prohibited formal Title VII class action suits, the Senate Committee stated that it agreed "with the courts that title VII actions are by their very nature class complains [sic], and that any restriction on such actions would greatly undermine the effectiveness of title VII." S.Rep.No. 415, 92d Cong., 1st Sess. 27 (1971).

19. *See, e. g., Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 250–51, 254–55 (3d Cir. 1975), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1976).

20. *Supra*, at 86.

Similarly, the conclusion that Scott may not represent a class consisting of faculty members who allegedly were discriminated against by the University's contract renewal, promotion and tenure practices is not, as I read it, meant to introduce a rigid rule regarding the numerosity prerequisite of Rule 23(a). The relevant question under Rule 23(a)(1) is whether "the class is so numerous that joinder of all members is impracticable," an inquiry that obviously is not susceptible to absolute quantification. Moreover, as has been noted above, "suits alleging racial or ethnic discrimination are often by their very nature class suits, involving classwide wrongs," [21] and it may generally be presumed that institutionalized discriminatory employment practices have prejudiced others besides the named plaintiff. But even though an individual plaintiff who establishes a classwide wrong may be entitled to injunctive relief dismantling the discriminatory practice and thereby benefiting similarly situated individuals as well, that in itself does not mean that the numerosity requirement of Rule 23(a) has been satisfied. This is so because a court must consider whether the alternative to a class action—joinder of the other allegedly aggrieved parties—is not impracticable, before it risks binding those parties without giving them the opportunity to litigate their individual claims. Here, Scott failed to demonstrate that joinder of the other present and past black faculty members, less than a score in number at the very most, is not the more sensible approach to organizing the lawsuit. In fact, Scott made no showing that any present or former faculty member other than himself has been discriminated against. As the majority notes, under these circumstances it would be improper to bootstrap an individual complaint into a class action by hypothesizing a class of aggrieved individuals on the basis of speculative future members, in view of the fact that the interests of individual class members may be prejudiced by such action.

"Across the board" class challenges to discriminatory practices have been recognized as enhancing the enforcement of Title VII and other antidiscrimination statutes, but their use must be carefully supervised by the courts.[22] The measured and prescient observations of Judge Godbold of the Fifth Circuit, who specially concurred in the seminal "across the board" class action decision, best capsulize the considerations that have come to the fore in this case:

> Over-technical limitation of classes by the district courts will drain the life out of Title VII, as will unduly narrow scope of relief once discriminatory acts are found. But without reasonable specificity the court cannot define the class, cannot determine whether the representation is adequate, and the employer does not know how to defend. And, what may be most significant, an over-broad framing of the class may be so unfair to the absent members as to approach, if not amount to, deprivation of due process. Envision the hypothetical attorney with a single client, filing a class action to halt all racial discrimination in all the numerous plants and facilities of one of America's mammoth corporations. One act, or a few acts, at one or a few places, can be charged to be part of a practice or policy quickening an injunction against all racial discrimination by the employer at all places. It is tidy, convenient for the courts fearing a flood of title VII cases, and dandy for the employees if their champion wins. But what of the catastrophic consequences if the plaintiff loses and carries the class down with him, or

---

**21.** *East Texas Motor Freight, Inc. v. Rodriguez,* 431 U.S. at 403, 97 S.Ct. at 1896. *See also Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d at 250.

**22.** Judicial solicitude for absent class members, through ensuring that all the requirements for bringing a class action are fulfilled, is especially important in the context of a Rule 23(b)(2) type action such as the present one. Inasmuch as absent class members need not be notified regarding the pendency of the suit, *see Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d at 254–57, they may be unaware that their claims are being decided and consequently may be unable to protect their own interests.

proves only such limited facts that no practice or policy can be found, leaving him afloat but sinking the class? [23]

23. *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122, 1126 (5th Cir. 1969).